**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ABIRA MEDICAL LABORATORIES, | : | |
| LLC d/b/a GENESIS DIAGNOSTICS, | : | CIVIL ACTION |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| UPMC HEALTH PLAN INC., et al., | : | No. 24-cv-0227 |
| *Defendants.* | : | |

<u>**MEMORANDUM**</u>

**KENNEY, J.**                                                    **November 3, 2025**

Defendants UPMC Health Plan Inc. and University of Pittsburgh Medical Center move for summary judgment on Plaintiff's claims (ECF No. 68). Plaintiff Abira Medical Laboratories, LLC d/b/a Genesis Diagnostics moves for summary judgment on Defendants' counterclaim (ECF No. 69). For the reasons set forth below, both Defendants' Motion (ECF No. 68) and Plaintiff's Motion (ECF No. 69) will be granted.

## I.       <u>BACKGROUND</u>

### A.  Factual Background

Plaintiff operated a medical testing laboratory until 2021. *See* ECF No. 68-3 at 3, 10. During the relevant period, Plaintiff was an out-of-network provider with respect to Defendant UPMC Health Plan Inc., which is a health insurer and subsidiary of Defendant University of Pittsburgh Medical Center (collectively, "Defendants"). *See id.* at 2–3. Prior to when its laboratory closed in 2021, Plaintiff would bill Defendants for the services it provided to Defendants' insureds. *See id.* at 3–4; *see also* ECF No. 68-6 at 282.

#### 1.  The 2017 Audit

In 2017, Defendants' fraud-detection software flagged Plaintiff's billing claims, *see* ECF No. 68-3 at 5; ECF No. 77-3 at 2, and Defendants commenced an audit of Plaintiff's billing

practices. ECF No. 68-3 at 4. As part of the audit, on April 28, 2017, Defendants requested that within fifteen business days, Plaintiff provide all medical records from October 1, 2016 to April 26, 2017 for six patients on behalf of whom Plaintiff had submitted claims. *See* ECF No. 68-9 at 2–3. Defendants also placed Plaintiff into prepayment review status—also referred to as prepayment hold—effective May 12, 2017, which required Plaintiff to submit paper copies of claims and medical records in order to be reimbursed. *Id.* at 3; *see also* ECF No. 68-3 at 5; ECF No. 77-3 at 2. Under prepayment review, "[c]laims submitted without medical records w[ould] be denied as lacking required supporting documentation." ECF No. 68-9 at 3.

Defendants sent a second request to Plaintiff for the above medical records, in connection with its audit, on May 25, 2017. *See* ECF No. 68-10 at 2. They followed up with a third request on June 8, 2017, which stated, "[t]o date we have not received those records." ECF No. 68-11 at 2. On August 24, 2017, Defendants reiterated that they had not received records from Plaintiff for the disputed claims. *See* ECF No. 68-12 at 2. They further stated that they had concluded their audit, which revealed that Defendants had overpaid Plaintiff by $154,269.20, for which Defendants requested payment within 45 calendar days. *See id.* at 2–3. Defendants noted that they "consider[ed] this review determination to be final," "w[ould] not extend appeal rights for this review," and took the "position that it is inappropriate for [Plaintiff] to seek reimbursement from [Defendants'] member for any of the services listed in the attached summary." *Id.* at 3.

At some point, Plaintiff requested to reopen the audit to submit supporting medical records, and Defendants granted that request on November 30, 2017. *See* ECF No. 68-14 at 2. Defendants notified Plaintiff of the results of the reopened audit in an April 9, 2018 letter. ECF No. 68-17 at 2; *see also* ECF No. 68-16 at 2 (in a March 29, 2018 email to Plaintiff, Defendants previewed the audit's findings and stated that a letter was forthcoming). That letter once again concluded that

Defendants overpaid Plaintiff, and it included a request for a revised $146,229.20 refund. ECF No. 68-17 at 2, 5. The letter further stated that this determination was "final" and that Defendants "w[ould] not extend appeal rights for this review." *Id.* at 5.

Plaintiff subsequently requested to reopen the audit a second time. *See* ECF No. 68-19 at 2–3. On May 3, 2018, Defendants rejected Plaintiff's request. *See id.* at 2. It is undisputed that Plaintiff has not refunded Defendants the alleged $146,229.20 overpayment. ECF No. 68-3 at 4.

On May 14, 2018, Plaintiff sent a letter to Defendants taking the position that Defendants were "not entitled to the $146,229.20 refund." ECF No. 68-20 at 2. The letter further stated that "there currently remain $669,807.67 of claims timely submitted by [Plaintiff] to [Defendants] for which no payment whatsoever has been made." *Id.* To that end, Plaintiff requested that Defendants identify any "documentation that [Defendants] believe[] is missing" to support the unpaid claims and stated that it thought the Parties could resolve the matter amicably. *See id.* at 3.

Plaintiff continued to submit claims to Defendants until approximately 2021. *See* ECF No. 68-6 at 282–83. It is undisputed that Defendants "paid some of [Plaintiff's] claims but did not pay others or did not pay in the amount requested by [Plaintiff]." ECF No. 68-3 at 4.

### 2.  FBI Raid and Loss of Operating Certificate

In January 2021, the Federal Bureau of Investigations raided Plaintiff's facility. *Id.* at 9. The following month, the U.S. Centers for Medicare & Medicaid Services ("CMS") paid Plaintiff a surprise site visit.[1] *Id.* CMS is responsible for issuing CLIA certificates to medical laboratories, which are required for laboratories to operate. *See id.*

On February 19, 2021, CMS sent a letter to Plaintiff stating that it had conducted a survey

---

[1] The Centers for Medicare & Medicaid Services are a federal agency within the U.S. Department of Health & Human Services. *See* ECF No. 68-3 at 9.

of Plaintiff's laboratory and identified deficient practices that "pose[d] immediate jeopardy to patient health and safety." ECF No. 68-23 at 2. Given "the seriousness of these deficiencies," CMS determined that if Plaintiff did not take immediate corrective measures, it faced suspension and revocation of its CLIA certificate, as well as other sanctions. *See id.* at 3.

In the following months, CMS performed additional site visits. *See* ECF No. 68-24 at 4–6. Afterward, on August 18, 2021, CMS provided notice that it would suspend and revoke Plaintiff's CLIA certificate. *Id.* at 2. CMS issued public notice of the suspension and revocation on December 7, 2021. ECF No. 68-25 at 2. The suspension and revocation also prohibited Plaintiff's leadership team from owning, operating, or directing a laboratory for two years. *See id.*

Plaintiff closed its laboratory in 2021. ECF No. 68-3 at 10.

### B. Procedural History

On January 18, 2024, Plaintiff initiated this action, *see* ECF No. 1 at 1, in which it alleged that Defendants had underpaid or had not paid some of its out-of-network claims, *see* ECF No. 20 at 2 (Amended Complaint). In connection with these allegations, Plaintiff sued Defendants for breach of contract (Count 1), as well as quantum meruit and unjust enrichment (Count 2), and it sought $907,669 in damages. ECF No. 20 at 2, 5, 7. To its complaint, Plaintiff attached an exhibit of the claim numbers allegedly at issue. *See id.* at 6–7, 10–61.

In response, Defendants brought a counterclaim for quantum meruit and unjust enrichment. *See* ECF No. 27 at 14–16. They asserted that Plaintiff had never refunded the $146,229.20 overpayment identified during the 2017 audit, and they sought relief on this basis. *See id.* at 15.

Defendants subsequently moved for summary judgment on Plaintiff's claims, ECF No. 68 at 2, and Plaintiff moved for summary judgment on Defendants' counterclaim, *see* ECF No. 69 at 2. The Parties' Motions are now before this Court.

## II.    LEGAL STANDARD

On a motion for summary judgment, the movant must show "that there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), when the evidence is viewed "in the light most favorable to the nonmoving party," *Nitkin v. Main Line Health*, 67 F.4th 565, 570 n.2 (3d Cir. 2023). If the non-movant bears the burden of proof on an issue, the moving party can satisfy its burden on summary judgment by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 771 (3d Cir. 2009). The burden then shifts to the non-moving party to point to evidence in the record that "create[s] material issues of fact 'such that a reasonable jury could find in its favor.'" *Bouriez*, 585 F.3d at 771 (quoting *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007)). And to meet that burden, the non-moving party must point to "particular parts of materials in the record" or establish why the "adverse party cannot produce admissible evidence to support [a] fact." *See* Fed. R. Civ. P. 56(c)(1)(A)–(B).

## III.    DISCUSSION

### A.  Defendants' Motion for Summary Judgment

Defendants move for summary judgment on Plaintiff's breach-of-contract and unjust enrichment claims. *See* ECF No. 68-2 at 16. They argue that these claims are time-barred and, regardless, fail on the merits. *See id.* The Court addresses the breach-of-contract and unjust enrichment claims in turn.

#### 1.  Breach-of-Contract Claim

Plaintiff argues that Defendants breached a contract by not paying Plaintiff for its medical services. ECF No. 20 at 6–7. With respect to Plaintiff's billing claims that were rejected during Defendants' 2017 audit, however, Plaintiff's suit is time-barred. And with respect to all other

claims Plaintiff submitted for payment, a reasonable jury could not find for Plaintiff on the merits, given the absence of evidence to support the elements of Plaintiff's case. Summary judgment to Defendants on Plaintiff's breach-of-contract claim is therefore proper.

### a. *Statute of Limitations*

The Court begins with Defendants' statute-of-limitations arguments. A federal court sitting in diversity applies state law to substantive issues, including to determining the statute of limitations. *See Jaworowski v. Ciasulli*, 490 F.3d 331, 333 (3d Cir. 2007). Under Pennsylvania law, which the Parties agree applies, *see, e.g.*, ECF No. 68-2 at 19–20 (citing Pennsylvania law); ECF No. 77 at 6–7 (same), a breach-of-contract claim has a four-year statute of limitations.[2] *Steiner v. Markel*, 968 A.2d 1253, 1255 n.5 (Pa. 2009).

The Parties agree that the statute of limitations is four years, but they dispute whether each claim for payment Plaintiff submitted had its own limitations period. *Compare* ECF No. 77 at 17, *with* ECF No. 86 at 20. According to Defendants, once they put Plaintiff on notice during the 2017 audit "that its practices were flawed and would result in denials or nonpayment," the statute of limitations began running for any claims Plaintiff was going to submit later, too. *See* ECF No. 86 at 21.

Defendants' argument fails under the circumstances of this case. Under Pennsylvania law, a breach-of-contract claim against an insurer generally begins to run when the insurer denies coverage. *See Erie Ins. Exch. v. Bristol*, 174 A.3d 578, 580 (Pa. 2017). Generally, that

---

[2] Defendants concede that "[a] 4-year statute of limitations applies" to Plaintiff's claims. ECF No. 68-2 at 23. However, they reserve the right to argue at trial that their insurance policies limited the statute of limitations to three years. *Id.* at 23 n.9. Because, for the purposes of summary judgment, Defendants do not develop the argument that a three-year statute of limitations applies, *see id.*, this Court will apply the standard four-year statute of limitations for a breach of contract under Pennsylvania law.

determination is made on a case-by-case basis. *See Amato v. Pa. Office of Att'y Gen.*, 183 F. App'x 260, 263 (3d Cir. 2006). Thus, an insurer can deny some claims, while approving others, and can also deny claims on different grounds. And given the case-by-case nature of insurance coverage, the denial of one claim ordinarily does not start the limitations clock for other, later-submitted claims. *Cf. Pritchard v. Regence Bluecross Blueshield*, 201 P.3d 290, 292 (Or. Ct. App. 2009) (holding that each "denial of a claim for benefits . . . causes harm to the insured separate from and independent of the injuries caused by the denial of other claims, and accordingly, constitutes a discrete breach" that is "independently actionable"); *Hood v. Cent. United Life Ins. Co.*, 664 F. Supp. 2d 672, 676 (N.D. Miss. 2009) (as a matter of Mississippi law, "[a] statute of limitations that begins to run with the acceptance or denial of each individual claim is more consistent with both general principles of equity and [state] law"); *Bank of Am., N.A. v. Dakota Homestead Title Ins. Co.*, 553 F. App'x 764, 768 (10th Cir. 2013) (in the context of a bad-faith claim under Colorado law, where the insurer "gave different reasons for each of its denials," the denials could each "constitute a separate bad faith act that would start the statute of limitations running anew").

Of course, in some instances, an insurer may clearly repudiate payment entirely or with respect to a class of claims. In that instance, the limitations clock for all such claims may begin to run from the time of repudiation. *See Romero v. Allstate Corp.*, 404 F.3d 212, 223 (3d Cir. 2005) (in ERISA context, finding that claims accrue either when they are formally denied or when benefits have been clearly repudiated). After all, it would be concerning if a provider could "avoid the statute of limitations by making the same argument to the insurer, triggering repeated denials," or ignoring an insurer's reproach that it will deny future claims, and then argue "that each denial restarts the statute of limitations." *Steeplechase II Condo. Ass'n, Inc. v. Travelers Indem. Co.*, No. 17-CV-01273, 2018 WL 6571392, at *5 (D. Colo. Dec. 13, 2018).

But even assuming the limitations period for a group of healthcare claims could be triggered by repudiation, Defendants did not clearly repudiate payment for claims submitted after the 2017 audit. Instead, Defendants placed Plaintiff into prepayment review, effective May 12, 2017. *See* ECF No. 68-9 at 3. That status meant that for any subsequent claims for reimbursement, Plaintiff would be required to submit a paper copy of the claim and accompanying medical records in order to be reimbursed. *See id.*; *see also* ECF No. 68-7 at 71–72 (discussing the process for reviewing claims while Plaintiff was on prepayment hold). And Plaintiff's corporate designee and Vice President of Research and Development, Abraham Miller, testified that Plaintiff complied with the requirements of prepayment review. *See* ECF No. 68-6 at 202–03. Though a jury could find Mr. Miller's testimony was not credible, it is not this Court's role at the summary judgment stage to make credibility determinations or weigh the evidence. *Paladino v. Newsome*, 885 F.3d 203, 209–10 (3d Cir. 2018). Defendants therefore did not clearly repudiate paying Plaintiff for claims submitted after the 2017 audit as a matter of law.[3]

In support of their theory, Defendants cite several cases, each of which is inapposite. *See* ECF No. 86 at 21 n.10. These cases involved routinely distributed benefits, such as disability benefits that were paid out each month. *See Keahy v. Federated Life Ins. Co.*, No. CV 20-6419, 2021 WL 4526164, at *4 (E.D. Pa. Oct. 4, 2021) (involving monthly disability benefits); *Leporace v. N.Y. Life & Annuity*, No. 11-cv-2000, 2011 WL 6739446, at *1 (E.D. Pa. Dec. 21, 2011) (same); *Sharr v. City of Scranton*, 3:23-cv-00826, 2024 WL 1094689, *1 (M.D. Pa. Mar. 13, 2024) (involving monthly pension benefits); *Casner v. AFSCME*, 658 A.2d 865, 871 (Pa. Commw. Ct.

---

[3] Abraham Miller testified that by 2021, it was evident that Defendants "w[ere] not paying claims because of the prepay hold." ECF No. 68-6 at 283. However, even if this amounted to a clear repudiation of any payment on any claims, and even if repudiation could start the limitations clock for any and all claims for payment, past and present, Plaintiff brought this action within four years of 2021, on January 18, 2024. ECF No. 1 at 1.

1995) (discussing situations in which "payment is received on a regular basis"). Because these cases involved the same routine payments, the limitations period for all payments sensibly began when the insured "first learn[ed] that his or her [right to routine payments] have been infringed." *See Keahy*, 2021 WL 4526164, at *2. Unlike in these cases, Plaintiff was not receiving the same, routine payments from Defendants. Instead, its claims were reviewed on a case-by-case basis.

Accordingly, Plaintiff's claims for reimbursement began to accrue when each claim was denied. A number of claims—but not all—were denied in Defendants' 2017 audit. These claims, which involved services provided to six patients, were rejected on August 24, 2017, or at the latest on May 3, 2018, when Defendants stated that they would not reopen the audit or reconsider Plaintiff's claims. *See* ECF No. 68-12 at 2–3 (on August 24, 2017, stating that Defendants overpaid Plaintiff with respect to billing claims related to six patients and that this determination was final); ECF No. 68-19 at 2 (on May 3, 2018, refusing to reopen audit or permit Plaintiff to resubmit claims, after reopening the audit once). And claims rejected during the 2017 audit are time-barred because Plaintiff initiated this lawsuit on January 18, 2024, *see* ECF No. 1 at 1, more than four years from either the August 2017 or May 2018 date.

For all other claims for payment, computing the statute of limitations is not so straightforward. The record does not appear to indicate when these claims were denied and, to the extent Defendants allegedly did not respond to the claims, what a customary response period would be.[4] *Cf. De Jongh v. State Farm Lloyds*, 664 F. App'x 405, 408 (5th Cir. 2016) (per curiam) (stating

---

[4] It is not even clear when Plaintiff submitted claims. As discussed in greater detail below, *see infra* Section III.A.1.c, Plaintiff relies almost exclusively on a chart of allegedly unpaid claims to support its case. The chart has a column titled "DOS," which contains dates, next to a column listing the year of service. *See* ECF No. 87 at 7. But it is unclear whether "DOS" refers to the date of service, date of claim submission, or something else. *See id.*

The one exception is a medical claim that Defendants reimbursed in July 2025, for which Plaintiff

that when "there is no outright denial of a claim, the exact date of accrual of a cause of action becomes more difficult to ascertain and should be a question of fact determined on a case-by-case basis" (citation omitted)).

Nonetheless, this Court does not need to wade into those murky waters. Plaintiff's suit for those claims fails on the merits, as discussed below.

### b.  *Contract Formation*

This Court turns to the merits of Plaintiff's breach-of-contract claim, which has three elements: (1) the existence of a contract, (2) which was breached by the defendant, and (3) as a result of which, the plaintiff suffered damages. *McShea v. City of Philadelphia*, 995 A.2d 334, 340 (Pa. 2010). Beginning with the first element, the record lacks evidence based on which a reasonable jury could conclude that the Parties formed a contract, and summary judgment to Defendants is therefore warranted.

A contract may be written, oral, or implied from the parties' conduct. *See Ingrassia Constr. Co. v. Walsh*, 486 A.2d 478, 483 n.7 (Pa. Super. Ct. 1984). Regardless of the form, "there must be a 'meeting of the minds,'" during which "both parties mutually assent to the same thing, as evidenced by an offer and its acceptance." *See Mountain Props. v. Tyler Hill Realty Corp.*, 767 A.2d 1096, 1101 (Pa. Super. Ct. 2001). And that meeting of the minds must cover all "essential terms" of the contract. *See Com. Bank v. First Union Nat'l Bank*, 911 A.2d 133, 147 (Pa. Super. Ct. 2006). One such term is price, though the parties may agree to either a specific number or a method for calculating price, such as "the 'fair market value' or 'reasonable value' of the services." *See Zvonik v. Zvonik*, 435 A.2d 1236, 1244 (Pa. Super. Ct. 1981).

---

produced evidence in support. *See* ECF No. 87 at 4, 19–21 (affidavit discussing claim and bank statement showing reimbursement). To the extent Plaintiff argues that it was underpaid for this claim, its suit would seemingly not be time-barred. But in any case, that claim fails on the merits, as discussed *infra* Section III.A.1.c.

Here, the Parties lack a written contract. It is undisputed that Plaintiff is an out-of-network provider with respect to Defendants, meaning that Defendants did not agree in writing to pay Plaintiff specific rates for different medical services. *See* ECF No. 68-3 at 3. Nonetheless, Plaintiff asserts that the Parties formed a contract in two ways.

First, Plaintiff argues that the Parties formed a contract through their course of conduct. *See* ECF No. 77 at 9–11. A contract may be implied from a course of conduct "when the actions of the parties reflect a 'mutual agreement and intent to promise,'" though that agreement has "not been expressed in words." *Konyk v. Pa. State Police of the Commonwealth*, 183 A.3d 981, 989 (Pa. 2018) (citation omitted). Similar to an express contract, the parties' actions must show that they "agree upon the [specific] obligations to be incurred." *See Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652, 659 (Pa. 2009).

Plaintiff asserts that the Parties' "normal course of dealing, the parties' conduct, and the parties' intent" created a contract, and it argues that Defendants reimbursed it for at least some past claims. ECF No. 77 at 9, 11. But Plaintiff points to no evidence that the Parties assented to specific payment rates, agreed to a method for determining rates, or that Defendants had a history of paying Plaintiff using a certain method or at certain prices. Other courts have required similar showings to find that an insurer and provider mutually assented to the material terms of an agreement, such as price and coverage. *Compare Bristol SL Holdings, Inc. v. Cigna Health & Life Ins. Co.*, No. 20-56122, 2022 WL 137547, at *1 (9th Cir. Jan. 14, 2022) (factual dispute existed as to existence of a contract where there was evidence of "hundreds of verification and authorization calls" by the provider, and "a prior course of dealing with [the insurer], specific and individualized treatment plans, as well as agreements over specific percentages of [] rates for the services rendered"), *with Dedicato Treatment Ctr. v. Indep. Blue Cross Blue Shield of Pa.*, No.

2:19-cv-3657, 2021 U.S. Dist. LEXIS 115681, at *9–10, *13 (C.D. Cal. Feb. 3, 2021) (where the parties had not discussed specific rates, and the "price of the treatment was left open-ended," there was no evidence of a contract or breach at summary judgment), *aff'd* 2021 U.S. App. LEXIS 38140 (9th Cir. Dec. 27, 2021), *and with Bergen Plastic Surgery v. Aetna Life Ins. Co.*, No. CV22-227, 2022 WL 4115701, at *2 (D.N.J. Sept. 9, 2022) (provider failed to plead contract where, although it alleged surgeries were pre-authorized and medically necessary, it pled nothing about the terms of the authorizations).

Plaintiff points to a certificate of coverage for Defendants' preferred provider organization (PPO) insurance plan. *See* ECF No. 77 at 9. That certificate states that "out-of-network non-emergent care and services that UPMC Health Plan has Prior Authorized or deemed Medically Necessary . . . will be paid according to your benefit design." ECF No. 77-5 at 1; *see also id.* at 31 (out-of-network emergency services that are "Medically Necessary" and "covered under the benefit plan . . . will be reimbursed at the Participating Provider reimbursement level"). Such language could certainly establish a method for calculating the price of an out-of-network provider's services. But nothing connects this certificate of coverage to any particular patients. There is no evidence in the record that the patients Plaintiff served had PPO plans, of the services they received, or about the insurance coverage they had at all. And "the question of whether any particular item or service is payable is ultimately determined on an insured-by-insured basis, subject to considerations of [the insured's] particular benefit plan." *See Speciality Med. Equip., Inc. v. UnitedHealth Grp., Inc.*, No. 22-CV-12396, 2023 WL 143940, at *7 (E.D. Mich. Jan. 10, 2023). Accordingly, a reasonable jury could not find that the parties formed "an implied contract broadly requiring Defendants to pay Plaintiff, on a prompt basis, for all [services] provided to various insureds, pursuant to the terms of varying benefit plans," based on one freestanding

certificate of coverage. *Id.*

Next, Plaintiff argues that the Parties formed a contract because policyholders assigned their right to receive payment to Plaintiff. *See* ECF No. 77 at 6. Parties can assign their rights under a contract, with some exceptions, unless a contract contains an anti-assignment clause.[5] *See Smith v. Cumberland Grp.*, 455 Pa. Super. 276, 285 (Pa. Super. Ct. 1997). And when an assignment is effective, the "assignee stands in the shoes of the assignor." *Crawford Cent. Sch. Dist. v. Commonwealth of Pa.*, 888 A.2d 616, 620 (Pa. 2005). Nonetheless, there must still be "a valid contract capable of being assigned." *See New York Life Ins. Co. v. K N Energy*, 80 F.3d 405, 412 (10th Cir. 1996).

Here, as Defendants observe, *see* ECF No. 68-2 at 18, the record lacks evidence about whether the patients on behalf of whom Plaintiff seeks payment were insured by Defendants and therefore had a "valid contract capable of being assigned." *K N Energy*, 80 F.3d at 412. Though Plaintiff cites to a spreadsheet containing patient names, that spreadsheet does not contain information about any patient's insurance plan. *See* ECF No. 87 at 7–16; ECF No. 80 at 7–15. Nor has Plaintiff pointed to a single other piece of evidence establishing the insurance policies held by patients. Plaintiff does not even, for that matter, point to evidence of assignment. Though Plaintiff's Complaint purports to excerpt an assignment of benefits signed by patients, ECF No. 20 at 5, Plaintiff has not pointed to any evidence of such assignments for the patients at issue—or even any patient at all. In fact, Plaintiff mentions assignment just once, in a header, in its summary judgment opposition. *See* ECF No. 77 at 6.

---

[5] Defendants note in passing that their policies contained anti-assignment clauses that barred policyholders from transferring their right to payment. *See* ECF No. 68-2 at 18 n.8. Nonetheless, they "assum[e] valid assignments" as a matter of summary judgment and "reserve[] the right to challenge the assignments" if the case proceeds to trial. *Id.* at 18 & n.8.

Nonetheless, even if Plaintiff were able to show a valid contract, Defendants have met their burden to show an absence of evidence supporting that such a contract was breached, as set forth below.

### c. *Breach*

The Court turns next to the second element of a contract claim: breach. Defendants argue that there is no evidence showing they were obligated to provide coverage, and therefore pay Plaintiff, for the insurance claims at issue in this suit. *See* ECF No. 68-2 at 18. A policyholder, or a party standing in the policyholder's shoes, bears the burden of "proving facts that bring [the insurance] claim within the policy's affirmative grant of coverage." *Wehrenberg v. Metro. Prop. & Cas. Ins. Co.*, 715 F. App'x 209, 212 (3d Cir. 2017) (citation omitted) (affirming grant of summary judgment to defendants on breach-of-contract claim because plaintiff failed to meet this burden); *see also Est. of O'Connell v. Progressive Ins. Co.*, 79 A.3d 1134, 1138 (Pa. Super. Ct. 2013). Once the plaintiff makes that showing, the burden shifts to the insurer to show that an exclusion or limitation on coverage applies. *Wehrenberg*, 715 F. App'x at 212.

Here, Plaintiff fails to supply evidence that creates a genuine dispute of fact about whether the services it provided fell within each policy's "affirmative grant of coverage." *Id.* The record lacks evidence of each patient's policy and the services he or she received. *See* ECF No. 68-3 at 3 (it is undisputed that Defendants' health insurance plans "provide for different benefits, depending on the terms and conditions stated in each plan's documents and the specific terms applicable to each individual member"). Plaintiff relies heavily on a spreadsheet of allegedly unpaid claims, which includes patient names, year of service, and that Defendant UPMC Health Plan was billed for each claim, among other columns. *See* ECF No. 87 at 7–16; ECF No. 80 at 7–15. But that spreadsheet, as discussed above, does not contain evidence of any patient's policy or information

about his or her treatment.[6] *See Amato*, 183 F. App'x at 263 (to determine if benefits are covered "under the [insurance] policy, an individualized inquiry must be conducted to determine if the specific facts and circumstances alleged provide for recovery").

Plaintiff's witnesses offer no testimony about whether the services provided fell within each policy's grant of coverage, either. Just the opposite—Plaintiff's corporate designee and Vice President of Research and Development, Abraham Miller, testified that he never read any of Defendants' health insurance policies, though he assumed that Plaintiff's services were covered.[7] *See* ECF No. 68-6 at 296–97; *see also Ambulatory Infusion Therapy Specialists, Inc. v. UniCare Life & Health Ins. Co.*, No. CIV.A. H-06-1857, 2007 WL 1520994, at *3 (S.D. Tex. May 22, 2007) (where provider's corporate officer testified that she had "never seen or requested" patient's policy, summary judgment to defendant-insurer was proper on provider's breach-of-contract claim). And though he was briefly asked about two particular patients, he did not testify to their insurance coverage. *See* ECF No. 68-6 at 166–78, 181–86, 189–94; *cf. also* ECF No. 68-7 at 122–29 (Heidi Beggan testimony). Alan Miller, a member of Plaintiff's board of directors, likewise testified that he had never read "any health care plan," did not know what benefits it provided, and did not know if "any given test performed by [Plaintiff] is covered or not." ECF No. 68-5 at 201–02. In light of these statements and the minimal evidence before this Court, a reasonable jury would

---

[6] Indeed, the spreadsheet seemingly does not even establish when claims were submitted. The spreadsheet contains a column identifying the year of service next to a column titled "DOS," which could possibly mean the date of service, date of submission, or something else. *See* ECF No. 87 at 7. But no evidence, such as the affidavit attaching the spreadsheet, defines the acronyms used on the spreadsheet.

[7] Abraham Miller also testified that Defendants had covered services in the past and that he "sure hope[d] Defendants" covered certain services. *See* ECF No. 68-6 at 296. But the mere fact that Defendants covered other services for other individuals in the past bears primarily on whether an implied contract existed, and it does not establish that with respect to the billing claims at issue, Defendants breached any obligations.

lack evidence based on which it could conclude that the services Plaintiff provided fell "within [each] policy's affirmative grant of coverage," and therefore whether a breach of payment obligations occurred. *Wehrenberg*, 715 F. App'x at 212; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a dispute of material fact is genuine when the evidence shows that "a reasonable jury could return a verdict for the nonmoving party").

Defendants also argue that this Court should not consider Plaintiff's spreadsheet because it is not authenticated. ECF No. 86 at 10. But the spreadsheet, even if it satisfied any authentication requirement,[8] is insufficient to satisfy Plaintiff's burden at summary judgment. On this record, there is no evidence supporting that the patients at issue were covered by Defendants or that the services they received fell within each policy's coverage. And because there is an absence of such evidence, a jury could not find that Plaintiff carried its burden. *See MedARC, LLC v. Scott & White Health Plan*, No. 3:20-CV-3241, 2022 WL 3044569, at *16 (N.D. Tex. Aug. 1, 2022) (granting summary judgment to defendant on breach-of-contract claim where out-of-network provider pointed to no evidence showing services had received insurer's prior approval); *Spinal Imaging, Inc. v. Aetna Health Mgmt. LLC*, Nos. CIV. 09-11873, CIV. 12-11521, 2014 WL 1278012, at *4 (D. Mass. Mar. 26, 2014) (where provider failed to show that insurance policies covered services,

---

[8] Circuits are split on whether parties must authenticate evidence at the summary judgment stage or need only show that the evidence could be authenticated at trial. *Compare Steffek v. Client Servs.*, 948 F.3d 761, 769 (7th Cir. 2020) (authentication required "even at the summary judgment stage"), *and G. v. Fay Sch.*, 931 F.3d 1, 14 (1st Cir. 2019) (same), *and Edwards v. Hiland Roberts Dairy, Co.*, 860 F.3d 1121, 1127 (8th Cir. 2017) (same), *and Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011) (same), *with Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1156 n.2 (11th Cir. 2021) ("[E]vidence does not have to be authenticated . . . to be considered at the summary judgment stage . . . ."), *and with Jacobs v. N.Y. City Dep't of Educ.*, 768 F. App'x 86, 87 n.1 (2d Cir. 2019). The Third Circuit has nodded to both these positions. *See Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 295 n.66, 302 (3d Cir. 2014) (upholding ruling that evidence was not properly authenticated at summary judgment stage, but also concluding that there was no basis "on which the deficiencies in the evidence could have been cured at the trial").

summary judgment in its favor was inappropriate on breach-of-contract claim); *Gomez v. Neighborhood Health P'ship, Inc.*, No. 24-11898, 2025 WL 2658881, at *5–6 (11th Cir. Sept. 17, 2025) (per curiam) (affirming summary judgment to defendant-insurer on ERISA claim where plaintiff failed to provide evidence that the procedures she received from an out-of-network provider were medically necessary, as required by her policy).

Plaintiff points to the fact that, in July 2025, Defendants reimbursed it $210 for a claim with an April 2021 date of service. *See* ECF No. 77 at 3–4; ECF No. 77-1 at 4, 9. It is unclear whether Plaintiff is arguing that Defendants underpaid it for this particular claim. The claim does not appear in Plaintiff's spreadsheet of disputed claims. *Compare* ECF No. 77-1 at 4 (identifying the $210 payment as corresponding to Claim No. JZ03465), *with* ECF No. 87 at 7–16 (containing no such claim number). However, regardless, Plaintiff points to no evidence that the rate it was paid for this claim breached the terms of any contract, as is Plaintiff's burden.

Lastly, this Court pauses to consider whether Defendants breached a contract by not merely denying, but failing to respond to, Plaintiff's claims for payment. Plaintiff does not develop such an argument in its summary judgment briefing, *see* ECF No. 77 at 1–21, though it mentioned the theory at the pleadings stage. Instead, at summary judgment, Plaintiff only briefly raises the issue of unanswered claims when discussing the statute of limitations. *See id.* at 16 (noting that "when the insure[r] has failed to make a determination on the claim . . . the breach of contract claim has not accrued"). But in any case, Plaintiff failed to supply evidence of when claims were submitted, which claims were not responded to at all, how long these claims have gone unanswered (save for the above $210 claim), and does not develop any argument about what a reasonable period for response would be. The record therefore does not support such a theory of breach, and this Court does not have occasion to consider it.

\* \* \* \*

Once Defendants pointed to the "absence of evidence to support [Plaintiff's] case," *Celotex*, 477 U.S. at 325, the burden shifted to Plaintiff to identify evidence that created genuine issues of material fact "such that a reasonable jury could find in its favor," *Bouriez*, 585 F.3d at 771 (citation omitted). Plaintiff failed to meet that burden here. Plaintiff points to no evidence concerning even basic facts of its case: what insurance policies patients held, what services each patient received, what steps were taken to ensure those services were covered, or even seemingly when each claim was submitted and, if applicable, whether it was denied or partially paid.[9]

That burden matters. *See Celotex*, 477 U.S. at 327. The procedures governing summary judgment "are designed 'to secure the just, speedy and inexpensive determination'" of cases. *See id.* (citation omitted). And where the party bearing the burden of proof at trial cannot supply evidence to support the elements of its case, the significant "private and public expenses that a trial entails" are unwarranted. *See Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989).

Accordingly, Defendants' Motion for Summary Judgment will be granted with respect to Plaintiff's breach-of-contract claim.[10]

---

[9] The lack of evidence in the summary judgment record is not surprising given the entirely haphazard approach Plaintiff took to discovery, which is the focus of this Court's opinion granting in part and denying in part Defendants' motion for sanctions. *See* ECF No. 60 at 1–5. Plaintiff submitted deficient discovery responses, *see* ECF No. 51 at 2, failed to correct its responses by the Court-imposed deadline, ultimately provided corrected responses that were themselves deficient, and repeatedly did not respond to Defendants' discovery requests and correspondence, *see* ECF No. 60 at 2–3; *see also id.* at 5 (for personal business reasons, Plaintiff's witnesses disregarded the Court's timeframe for scheduling depositions).

[10] Plaintiff also argues that "Defendant's Motion to Dismiss the [b]reach of [c]ovenant of [g]ood [f]aith and [f]air [d]ealing [s]hould be [d]enied." ECF No. 77 at 11. However, Plaintiff does not bring a claim for breach of the covenant of good faith and fair dealing, *see* ECF No. 20 at 1–8, which in any case would fail on the merits due to Plaintiff's failure to show evidence of a contract or breach.

### 2.  Quantum Meruit and Unjust Enrichment Claim

The Court turns next to Plaintiff's quantum meruit and unjust enrichment count, which alleges that Defendants should have paid Plaintiff for the insurance claims it submitted but instead inequitably retained those funds. *See* ECF No. 20 at 7. However, as with Plaintiff's breach-of-contract claim, Plaintiff's quantum meruit and unjust enrichment claims fail, too. With respect to the claims Defendants denied in the 2017 audit, Plaintiff's quantum meruit and unjust enrichment count is barred by the statute of limitations. And for all other claims for payment, Plaintiff's suit fails on the merits.

### a.  *Statute of Limitations*

Defendants argue that Plaintiff's quantum meruit and unjust enrichment claims are time-barred. *See* ECF No. 68-2 at 23. Quantum meruit and unjust enrichment claims, like breach-of-contract claims, have a four-year statute of limitations *See Sevast v. Kakouras*, 915 A.2d 1147, 1153 (Pa. 2007); *Fowkes v. Shoemaker*, 661 A.2d 877, 880 (Pa. Super. Ct. 1995). When such a claim arises from an insurer's failure to pay for services, the claim begins to accrue when the insurer repudiates payment or denies coverage. *See Colonial Assurance v. Mercantile & Gen. Reins. Co.*, 130 F. App'x 607, 609 (3d Cir. 2005) (applying Pennsylvania law).

Above, this Court determined that for Plaintiff's breach-of-contract claim, each claim Plaintiff submitted for reimbursement had its own limitations period. *See supra* Section III.A.1.a. That reasoning applies with similar force to Plaintiff's quantum meruit and unjust enrichment claims. *See Plavin v. Grp. Health Inc.*, 857 F. App'x 83, 87 (3d Cir. 2021) (claim arising from February 2015 reimbursement not time-barred, even though billing claims "for different medical procedures" fell outside the limitations period); *Neurological Surgery Prac. of Long Island, PLLC v. CIGNA Health & Life Ins. Co.*, No. 2:21-cv-01549, 2025 U.S. Dist. LEXIS 128388, at *23

(E.D.N.Y. July 2, 2025) (looking to individual dates of service to determine if unjust enrichment, breach-of-contract, and ERISA claims were time-barred), *R&R adopted,* 2025 U.S. Dist. LEXIS 193719 (E.D.N.Y. Sept. 30, 2025). Thus, for the reasons identified *supra* Section III.A.1.a, with respect to claims denied in Defendants' 2017 audit, Plaintiff's suit is time-barred. *See supra* Section III.A.1.a (identifying medical billing claims related to six patients that were rejected on August 24, 2017, or at the latest on May 3, 2018). As to all other medical claims, determining the statute of limitations is less straightforward, but those claims regardless fail on the merits.

      **b.** *Merits*

      To prevail on an unjust enrichment claim, a plaintiff must show that it conferred a benefit on the defendant, the defendant appreciated the benefit, and it "would be inequitable for defendant to retain the benefit without payment of value." *Gutteridge v. J3 Energy Grp., Inc.*, 165 A.3d 908, 917 (Pa. Super. Ct. 2017) (en banc) (citation omitted). And though Pennsylvania courts have equivocated on whether unjust enrichment and quantum meruit claims differ,[11] in an action based on the provision of services, a "claim for damages in *quantum meruit* is fundamentally an equitable claim of unjust enrichment." *Melmark, Inc. v. Schutt ex rel. Schutt*, 206 A.3d 1096, 1109 (Pa. 2019) (citation omitted).

      Here, the record lacks evidence that Defendants inequitably benefited by failing to pay Plaintiff's claims. Whether Plaintiff was entitled to payment depends on whether the services each patient received were covered by Defendants' insurance plans. And, as discussed above, Plaintiff has pointed to no evidence regarding each patient's insurance coverage, of the specific services Plaintiff provided to each patient, whether those services were covered by insurance, or even

---

[11] *Compare Artisan Builders, Inc. v. Jang*, 271 A.3d 889, 892 (Pa. Super. Ct. 2022) (explaining the difference between the two theories), *with Ne. Fence & Iron Works, Inc. v. Murphy Quigley Co.*, 933 A.2d 664, 667 (Pa. Super. Ct. 2007) (describing these theories as synonymous).

seemingly the date on which Plaintiff submitted claims. *See supra* Section III.A.1.c. Without that evidence, a reasonable jury could not determine whether Defendants inequitably benefited by declining to pay Plaintiff or whether no coverage was required. *Cf. Air Evac EMS, Inc. v. USAble Mut. Ins. Co.*, 931 F.3d 647, 655 (8th Cir. 2019) (insurer was not unjustly enriched where its limited reimbursements were consistent with policy terms).[12]

Because some of Plaintiff's claims are time-barred, and the summary judgment record lacks evidence to support Plaintiff's case on the merits, Defendants' Motion for Summary Judgment will be granted.[13]

### B.  Plaintiff's Motion for Summary Judgment on Defendants' Counterclaim

Plaintiff moves for summary judgment on Defendants' unjust enrichment and quantum meruit counterclaim, arguing it is time-barred and should be rejected as improper cross-plan offsetting. *See* ECF No. 69-3 at 7, 9. Because Defendants' claims are time-barred, this Court need not reach the cross-plan offsetting issue.

As set forth above, *see supra* Section III.A.2.a, quantum meruit and unjust enrichment

---

[12] This is not to say that a provider can never confer benefits on an insurer. Though some courts have held that a provider confers benefits only to the insured, *see, e.g.*, *Advanced Orthopedics & Sports Med. Inst. v. Anthem Blue Cross Life & Health Ins. Co.*, No. 17-cv-8848, 2018 U.S. Dist. LEXIS 212024, at *11 (D.N.J. Dec. 14, 2018) (dismissing quantum meruit claim because "the benefit at issue was conferred upon [the patient], not [the insurer]"), the Third Circuit has stated that when a "provider claims unjust enrichment against an insurer, the benefit conferred, if any, is not the provision of the healthcare services per se, but rather the discharge of the obligation the insurer owes to its insured." *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 240 (3d Cir. 2020). *But see Abira Med. Lab'ys, LLC v. Cigna Health & Life Ins. Co.*, No. 24-2837-CV, 2025 WL 1443016, at *2 (2d Cir. May 20, 2025) ("[I]n the health insurance context, courts have repeatedly held that providers cannot bring unjust enrichment claims against insurance companies based on the services rendered to the insureds." (citation omitted)).

[13] Because the Court finds that, with respect to some claims for coverage, Plaintiff's unjust enrichment and quantum meruit claims are time-barred, and that all claims in any case fail on the merits, it does not reach Defendants' arguments about whether the existence of a contract precludes Plaintiff from asserting unjust enrichment and quantum meruit claims. *See* ECF No. 68-2 at 20–22.

claims have a four-year statute of limitations under Pennsylvania law. *See Sevast*, 915 A.2d at 1153; *Fowkes*, 661 A.2d at 880. That four-year period bars Defendants' counterclaim here. Defendants' counterclaim arises from Plaintiff's failure to refund the $146,229.20 sum that Defendants allegedly overpaid to Plaintiff. *See* ECF No. 27 at 15. Defendants gave Plaintiff notice of the overpayment on April 9, 2018, and demanded that Plaintiff pay this amount within forty-five days. ECF No. 68-17 at 2–5. Defendants' counterclaim therefore began to accrue at the latest on May 25, 2018, after the forty-five-day deadline passed. And the statute of limitations therefore expired in May 2022, multiple years before Defendants brought this counterclaim.

In their opposition, Defendants effectively concede that their counterclaim is time-barred. *See* ECF No. 72 at 5, 7 (stating that "the parties now agree on the law and the facts and their application here" and arguing that both Parties' motions for summary judgment "should be granted equally"). However, according to Defendants, if their counterclaim is time-barred, all of Plaintiff's claims are too. *See id.* at 5. The Court addressed the limitations period for Plaintiff's claims above. *See supra* Section III.A.1–2.

Because Defendants' counterclaim is time-barred, Plaintiff's Motion for Summary Judgment will be granted. However, the Court declines to award the attorney's fees that Plaintiff requested in its Motion. *See* ECF No. 69 at 2. Such an award is typically warranted only if a statute or agreement authorizes recovery, and Plaintiff has not shown that this condition is met here. *See Barnhart v. Compugraphic Corp.*, 936 F.2d 131, 133 (3d Cir. 1991).

## IV.    CONCLUSION

For the foregoing reasons, this Court will **GRANT** Defendants' Motion for Summary Judgment on Plaintiff's claims (ECF No. 68) and Plaintiff's Motion for Summary Judgment on

Defendants' counterclaim (ECF No. 69).[14] An appropriate Order will follow.

---

[14] Based on the foregoing, Defendants are the prevailing party. When neither party prevails on its affirmative claims, district courts must determine the prevailing party on a case-by-case basis. *Tyler v. O'Neill*, 112 F. App'x 158, 162 (3d Cir. 2004). To aid in that determination, courts may look to "the relative 'size' of the counterclaims in comparison to the counts in the complaint" and consider whether the defendant's counterclaims "require proof outside the scope of the plaintiff's claim." *Id.*

Here, Defendants are seemingly the prevailing party. Though Defendants did not prevail on their counterclaim for $146.229.20, *see* ECF No. 27 at 14, that counterclaim is a fraction of Plaintiff's claims for $907,669.00, *see* ECF No. 20 at 8. And this Court's summary judgment ruling on the counterclaim turns on the same facts and evidence as Plaintiff's affirmative case, with respect to claims Plaintiff submitted on behalf of the six patients at issue in the 2017 audit. *See Tyler*, 112 F. App'x at 162 (affirming award of costs in favor of the defendants where their counterclaim "involved the same legal and factual issues" as the complaint and "did not require proof outside of [Plaintiff's] claim"). Plaintiff's claims were also the subject of much more extensive summary judgment briefing.